In re George Brian HANLEY, Lynda Laureen Hanley, Debtors.

Barry M. BARASH, Chapter 7 Trustee for Lynda L. HANLEY, et al., Plaintiff,

v.

ROYCE, INC., d/b/a Royce Rentals, Defendant.

In re Richard Charles GROOM, Debtor.

Richard C. GROOM, Plaintiff,

v.

ROYCE, INC., d/b/a Royce Rentals, Defendant.

Bankruptcy Nos. 89–80262, 89–80875. Adv. Nos. 89–8084, 89–8087.

United States Bankruptcy Court, C.D. Illinois.

Sept. 26, 1989.

Barry M. Barash, Galesburg, Ill., plaintiff, pro se.

Thomas L. Perkins, Peoria, Ill., for defendant.

## OPINION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

Prior to each of the Debtors filing their separate bankruptcy proceedings, each Debtor had entered into Rental Purchase Agreements (AGREEMENTS) with the Defendant. Although not identical, the AGREEMENTS are similar. Each of the AGREEMENTS sets forth the amount of the cash price of the property subject to the AGREEMENTS and indicates that the cash price is the price at which the Debtors may purchase the property on the date of the AGREEMENTS. The AGREEMENTS then go on to provide for an initial rental period, which is either one or two weeks. The Debtors are not obligated to renew the rental aspect of the AGREEMENTS but may, at their option, do so for additional periods by sending renewal period lease payments for as long as the Debtors want to renew the AGREEMENTS. The

AGREEMENTS indicate the total number and the total amount of rental payments necessary to acquire ownership of the property on the rental payment basis. For example, Lynda L. Hanley's agreement with the Defendant provides the cash price for a clothes dryer is $338.00 plus tax, the initial rental period is two weeks, the renewal period is on a weekly basis, and in order to acquire ownership of the property, the total number of rental payments and the total amount of rental payments is 91 and $788.06, respectively. The Defendant has the obligation to maintain the property. The Debtors are liable for any damage to the property which is in the excess of ordinary wear and tear. They can obtain insurance to cover this risk, but are not obligated to do so. Each AGREEMENT has an Early Buy–Out Option, which permits the Debtors to buy the property at any time during the effective period of the AGREEMENT by paying a price equal to the total of all scheduled payments less the total of payments made; times 50%, except during the first ninety days of the AGREEMENT when the percentage adjustment is 40%.

After the Debtors filed their bankruptcy proceedings, adversary proceedings were filed against the Defendant alleging that the AGREEMENTS violated the Federal Consumer Leasing Act (FCLA), 15 U.S.C. Section 1667 *et seq.*, and regulations promulgated thereto (Regulation M), 12 C.F.R. Part 213, and the Federal Truth–in–Lending Act, 15 U.S.C. Section 1601, *et seq.*, (TILA) and regulations promulgated thereto (Regulation Z), 12 C.F.R. Part 226.

In response, the Defendant filed a Motion to Dismiss on the basis that the AGREEMENTS are not subject to the provisions of either FCLA or TILA and the regulations promulgated pursuant thereto. Specifically, the Defendant argues the AGREEMENTS are not consumer leases as defined by the FCLA and Regulation M, because the Debtors have the right to terminate the AGREEMENTS at will after the initial rental period, and therefore they are not contracts for the use of personal property for a period of time exceeding four months, and the AGREEMENTS do not constitute credit sales under TILA, as the Debtors are not obligated to make payments in an amount substantially equivalent to or in excess of the total value of the property subject to the AGREEMENT.

In response, the Plaintiffs filed a Motion for Judgment on the Pleadings, and took the position that judgment should be entered in their behalf as the AGREEMENTS are either sales or lease transactions and fall within the scope of one of the two Federal Consumer Protection Acts. In their view, the AGREEMENTS are in fact disguised security agreements, and subject to TILA.

The FCLA defines "consumer lease" to mean

[A] contract in the form of a lease or bailment for the use of personal property by a natural person for a period of time exceeding four months, and for a total contractual obligation not exceeding $25,000, primarily for personal, family, or household purposes, whether or not the lessee has the option to purchase or otherwise become the owner of the property at the expiration of the lease, except that such term shall not include any credit sale as defined in section 103(g).

15 USCA Section 1667.

Section 213.2(a)(6) of Regulation M defines "consumer lease" to mean

[A] contract in the form of a bailment or lease for the use of personal property by a natural person primarily for personal, family or household purposes, for a period of time exceeding four months, for a total contractual obligation not exceeding $25,000, whether or not the lessee has the option to purchase or otherwise become the owner of the property at the expiration of the lease. It does not include a lease which meets the definition of a credit sale in Regulation Z, 12 CFR Part 226.2(a) nor does it include a lease for agricultural, business or commercial purposes or one made to an organization.

12 C.F.R. Section 213.2.

The Federal Reserve Board's (FRB) Official Staff Commentary 2(a)(6)–2 to that section states:

Period of time. To be a consumer lease, the initial term of the lease must be more than 4 months. Thus, a lease of personal property for 4 months, 3 months or on a month-to-month or week-to-week basis (even though the lease actually extends beyond 4 months) is not a consumer lease and is not subject to the disclosure requirements of the regulation. A lease with a penalty for cancelling during the first 4 months is considered to have a term of more than 4 months. A month-to-month or week-to-week extension of a lease that was originally for 4 months or less is not a consumer lease, even if the extension actually lasts for more than 4 months. For example, a 3–month lease extended on a month-to-month basis and terminated after 1 year does not require consumer lease disclosures.

1 CCH Consumer Credit Guide, para. 3591.32.

A plain reading of these definitions precludes a finding that these rent-to-own AGREEMENTS are subject to FCLA and Regulation M. In order to be governed by the provisions of FCLA and Regulation M the agreement must constitute a consumer lease. To constitute a consumer lease the agreement must be a contract for a period of time exceeding four months. *Stewart v. Remco Enterprises, Inc.*, 487 F.Supp. 361 (D.Neb.1980); *Smith v. ABC Rental Systems of New Orleans, Inc.*, 491 F.Supp. 127 (E.D.La.1978), *aff'd per curiam*, 618 F.2d 397 (5th Cir.1980). In this particular case, the Debtors were not contractually bound to make payments for a period of time exceeding four months. At any time after the initial rental payment was made, the Debtors were free to walk away from the agreement without any further liability. As the Debtors had this right, it was not a contractual relationship falling within the scope of the definitions of the term "consumer lease." Therefore, the provisions of FCLA and Regulation M are not applicable to the AGREEMENTS.

The Plaintiffs also argue that if the AGREEMENTS are not subject to the provisions of FCLA and Regulation M, then they are subject to the provisions of TILA and Regulation Z. TILA defines "credit sale" to mean

[A]ny sale in which the seller is a creditor. The term includes any contract in the form of a bailment or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the property and services involved and it is agreed that the bailee or lessee will become, or for no other or a nominal consideration has the option to become, the owner of the property upon full compliance with his obligations under the contract.

And the term "creditor" to mean

[A] person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, ...

15 USC Section 1602.

Section 226.2(a) of Regulation Z defines these two terms as follows:

(16) "Credit sale" means a sale in which the seller is a creditor. The term includes a bailment or lease (unless terminable without penalty at any time by the consumer) under which the consumer:

(i) Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and services involved; and

(ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement.

(17) "Creditor" means:

(i) A person (A) who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a downpayment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is

no note or contract....[1]

12 CFR Section 226.2.

The FRB Official Staff Commentaries to the definition of "creditor" state as follows:

No. 2(a)(17)–1. General. The definition contains 5 independent tests. If any one of the tests is met, the person is a creditor for purposes of that particular test.

No. 2(a)(17)(i)–1. Prerequisites. This test is composed of 2 requirements, both of which must be met in order for a particular credit extension to be subject to the regulation and for the credit extension to count towards satisfaction of the numerical tests mentioned in footnote 3 to Section 226.2(a)(17). First, there must be either or both of the following:

—A written (rather than oral) agreement to pay in more than 4 installments. A letter that merely confirms an oral agreement does not constitute a written agreement for purposes of the definition.

—A finance charge imposed for the credit. The obligation to pay the finance charge need not be in writing. 1 CCH Consumer Credit Guide, para. 3211.48–.49.

■ The definition of "credit sale" means a sale in which the seller is a creditor. The term includes a lease, where, unless terminable without penalty by the debtor, the debtor agrees to pay as compensation a sum substantially equivalent to, or in excess of, the value of the property, and will become, or has the option to become, with no additional or nominal consideration, the owner of the property upon compliance with the agreement. In their oral arguments, both the Plaintiffs and the Defendant addressed the issue of whether termination results in a penalty. The Plaintiffs contend there is one, in that the Debtors incur an economic penalty when they fail to continue leasing, as they lose the benefit of their previous payments and the use of the property. The Defendant contends such does not constitute a penalty for termination. This Court agrees with the Defendant. The AGREEMENTS do not provide that in the event of termination the Debtors are required to pay an additional sum or additional percentage in order to terminate. Upon termination, the Debtors merely lose the use of the property without any refund of what they previously paid. This result does not constitute a penalty. It is the normal consequence of terminating any lease. The lessor gets the property back and keeps the lease payments for the period that the lessee used the property.

There is yet another reason why the AGREEMENTS cannot be considered written sales agreements under the latter portion of the definition of "credit sale" devoted to leases. The Debtors did not agree to pay a sum substantially equivalent to or in excess of the value of the property subject to the AGREEMENTS. The Debtors are only obligated to make the small single payment. Anything else was strictly at their option.

Some courts have agreed with this analysis and result. *See Stewart v. Remco Enterprises, Inc., supra; Smith v. ABC Rental Systems of New Orleans, Inc., supra.* Others have not and have permitted debtors to show that the leases are disguised sale agreements which are subject to TILA and Regulation Z. *See Waldron v. Best T.V. & Stereo Rentals, Inc.,* 485 F.Supp. 718 (D.C.M.D.1979); *Clark v. The Rent–It Corporation,* 685 F.2d 245 (C.A. 8th Cir.1982).

■ However, none of the reported decisions have considered the total definition of the term "credit sale". The inclusion of the reference to leases as part of the definition, broadens the definition. It does not limit it. So the issue remains, can a rent-to-own transaction which fails to fall within the scope of the expanded definition pertaining to lease transactions still fall within the scope of the basic definition of "credit

1. Section 226.2(a)(17) contains three other subparagraphs which adds three more tests for determining when a person falls within the definition of the term "creditor". These three tests involve the use of credit cards and are not applicable to the case before this Court.

sale" found in Section 1602 of TILA and Section 226.2(a)(16) of Regulation Z.

■ This Court believes it can. The term means a sale where the seller is a creditor, and a person is a creditor if the transaction results in a finance charge being incurred, or the obligation is payable by written agreement in four or more installments. As previously indicated, there is no obligation to make four installment payments. The obligation is for a single payment and thereafter the Debtors, at their option, are free to make additional payments if they so elect. However, if the Defendant is regularly extending consumer credit that is subject to a finance charge, it can still fall within the scope of the definition of the term "creditor" and the definition of the term "credit sale" even though the agreement calls for less than four installments. *In re Maxwell*, 22 B.R. 958 (Bkrtcy.D.R.I.1982).[2]

■ During the initial stages of Truth–in–Lending, the courts construed the original TILA and Regulation Z so as to prevent creditors from disguising the true nature of the transaction and thereby avoiding the impact of Truth–in–Lending. The courts looked beyond the stated nature of the transaction to determine its true nature. In *Joseph v. Norman's Health Club, Inc.; Morse v. Same; Yost v. Same; Greco v. Same*, CCH Consumer Credit Guide, para. 99,274, 336 F.Supp. 307 (E.D.Mo.1971), the court held the fact that the cash or credit price of health club memberships were the same was not conclusive on the issue of whether or not a finance charge was imposed and that a seller engaged in long term credit may not abolish the Truth–in–Lending Act by merely charging a single cash or credit price while knowing that the great bulk of its customers will buy on credit. The same analysis is applicable to the case before this Court. Regardless of what the AGREEMENTS are called, or how they are ostensively structured, if they involve consumer credit with finance charges being incurred, they are credit sales within the scope of TILA and Regulation Z.

This last issue cannot be decided by motions. *See Yazzie v. Reynolds*, CCH Consumer Credit Guide, para. 97,374, 623 F.2d 638 (C.A.10th Cir.1980); cert. den., 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980). (Seller of used motor vehicles who used instalment contracts which provided for four or more payments payable on a prearranged schedule in 98% of his sales, but did not quote or charge any of his customers different prices whether they paid in cash or paid by instalments, was not entitled to summary judgment against purchasers who brought suit alleging a failure to disclose a finance charge and to express it as an annual percentage rate under Truth–in–Lending). A resolution of this issue requires evidence as to how the Defendant's customers acted. Did they lease for a short period and then terminate, or did they make the renewal payments and keep the property, and in so doing pay a finance charge?

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order. ·

### ORDER

For the reasons set forth in an Opinion filed this day:

IT IS, THEREFORE, ORDERED:

Both the Defendant's Motion to Dismiss and the Plaintiffs' Motion for Judgment on the pleadings be and the same are hereby DENIED.

IT IS FURTHER ORDERED that the Defendant shall have 21 days within which to answer or otherwise plead to the complaint.

DATED: September 26, 1989.

---

**2.** A summary of the case can be found at 1 CCH Consumer Credit Guide, para. 2345.22.