In re George Brian **HANLEY, Lynda Laureen Hanley, Debtors.**

**Barry M. BARASH, Chapter 7 Trustee for Lynda L. Hanley, et al., Plaintiff,**

v.

**ROYCE, INC., d/b/a Royce Rentals, Defendant.**

In re Richard Charles **GROOM, Debtor.**

**Richard C. GROOM, Plaintiff,**

v.

**ROYCE, INC., d/b/a Royce Rentals, Defendant.**

In re Charles LaVerne **SPENCER and Georgianne Spencer, Debtors.**

**Charles LaVerne SPENCER and Georgianne Spencer, Plaintiffs,**

v.

**ROYCE, INC., d/b/a Royce Rentals, and Dennis J. Cain, Defendants.**

**Bankruptcy Nos. 89–80262, 89–80875 and 89–71262.**

**Adv. Nos. 89–8084, 89–8087 and 89A–7147.**

United States Bankruptcy Court, C.D. Illinois.

March 12, 1990.

Barry M. Barash, Galesburg, Ill., for plaintiffs.

Thomas L. Perkins, Peoria, Ill., for defendants.

## OPINION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

Originally, this Court issued its Opinion denying the Defendant's Motions to Dismiss filed in *In re Hanley* and in *In re Groom* 105 B.R. 458 (1989). The Defendant then filed Motions to Alter or Amend Judgment. While these two cases were pending, a third case, *In re Spencer,* was filed against the Defendant, who filed a similar Motion to Dismiss which raised the same issues that are raised in *Hanley* and *Groom.* A hearing was held on the two motions to alter or amend judgment and the latest motion to dismiss and they were taken under advisement.

Prior to each of the Debtors filing their separate bankruptcy proceedings, each Debtor had entered into Rental Purchase Agreements (AGREEMENTS) with the Defendant. Although not identical, the AGREEMENTS are similar. Each of the AGREEMENTS sets forth the amount of the cash price of the property subject to the AGREEMENTS and indicates that the cash price is the price at which the Debtors may purchase the property on the date of the AGREEMENTS. The AGREEMENTS then go on to provide for an initial rental period, which is either one or two weeks. The Debtors are not obligated to renew the rental aspect of the AGREEMENTS but at their option may do so for additional periods by sending renewal period lease payments for as long as the Debtors want to renew the AGREEMENTS. The AGREEMENTS indicate the total number and the total amount of rental payments necessary to acquire ownership of the property on the

rental payment basis. For example, Lynda L. Hanley's agreement with the Defendant provides the cash price for a clothes dryer is $338.00 plus tax, the initial rental period is two weeks, the renewal period is on a weekly basis, and in order to acquire ownership of the property, the total number of rental payments and the total amount of rental payments is 91 and $788.06, respectively. The Defendant has the obligation to maintain the property. The Debtors are liable for any damage to the property which is in the excess of ordinary wear and tear. They can obtain insurance to cover this risk, but are not obligated to do so. Each AGREEMENT has an Early Buy–Out Option, which permits the Debtors to buy the property at any time during the effective period of the AGREEMENT by paying a price equal to the total of all scheduled payments less the total of payments made, times 50%, except during the first ninety days of the AGREEMENT when the percentage adjustment is 40%.

After the Debtors filed their bankruptcy proceedings, adversary proceedings were filed against the Defendant alleging that the AGREEMENTS violated the Federal Consumer Leasing Act (FCLA), 15 U.S.C. Section 1667 *et seq.*, and regulations promulgated thereto (Regulation M), 12 C.F.R. Part 213, and the Federal Truth-in-Lending Act, 15 U.S.C. Section 1601, *et seq.*, (TILA) and regulations promulgated thereto (Regulation Z), 12 C.F.R. Part 226.

In response, the Defendant filed Motions to Dismiss on the basis that the AGREEMENTS are not subject to the provisions of either FCLA or TILA and the regulations promulgated pursuant thereto. Specifically, the Defendant argued the AGREEMENTS are not consumer leases as defined by the FCLA and Regulation M, because the Debtors have the right to terminate the AGREEMENTS at will after the initial rental period, and therefore they are not contracts for the use of personal property for a period of time exceeding four months, and the AGREEMENTS do not constitute credit sales under TILA, as the Debtors are not obligated to make payments in an amount substantially equivalent to or in excess of the total value of the property subject to the AGREEMENT.

In response, the Plaintiff took the position that the AGREEMENTS are either sales or lease transactions and fall within the scope of one of the two Federal Consumer Protection Acts. In his view, the AGREEMENTS are in fact disguised security agreements and subject to TILA.

This Court's previous Opinion in *Hanley* and *Groom*, found that the AGREEMENTS were not subject to FCLA, as to fall within the provisions of FCLA the AGREEMENTS must constitute a consumer lease, and to constitute a consumer lease the AGREEMENTS must obligate the debtor for a period exceeding four months, but as the debtors were not contractually bound to make payments for a period of time exceeding four months, there was no contractual relationship falling within the scope of the definition of the term "consumer lease".

As to the alleged TILA violations, the opinion began with a reference to the following definitions of "credit sale" and "creditor" found in both TILA and Regulation Z. In TILA the term "credit sale" means:

[A]ny sale in which the seller is a creditor. The term includes any contract in the form of a bailment or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the property and services involved and it is agreed that the bailee or lessee will become, or for no other or a nominal consideration has the option to become, the owner of the property upon full compliance with his obligations under the contract.

And the term "creditor" means

[A] person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, ...
15 U.S.C. Section 1602.

Section 226.2(a) of Regulation Z defines these two terms as follows:

(16) "Credit sale" means a sale in which the seller is a creditor. The term includes a bailment or lease (unless terminable without penalty at any time by the consumer) under which the consumer:

(i) Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and services involved; and

(ii) will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement.

(17) "Creditor" means:

(i) A person (A) who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a downpayment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract....

12 CFR Section 226.2.

The opinion then addressed the arguments raised by the parties and found that the agreement did not fall within that portion of the definitions pertaining to bailments or leases as there was no penalty associated with termination of the agreements and the debtors did not agree or were not obligated to pay a sum substantially equivalent to or in excess of the value of the property subject to the agreements. They were only obligated to make one small payment with anything else at their option.

However, the opinion went on to find, that notwithstanding the fact the agreements did not fall within the inclusive language referring to bailments and leases, the agreements could constitute a "credit sale" if it could be established the defendant is a "creditor", a term defined to mean a person who regularly extends consumer credit that is subject to a finance charge, and that determination could only be made after a full evidentiary hearing.

In response, the Defendant filed Motions to Alter or Amend Judgment as to the TILA portion of the opinion. The basis of the motions is twofold. First, the Court's construction of TILA and Regulation Z results in an application of the definition in three instances which renders the second alternative, which is expressly stated in the statute and regulation, a nullity since it subsumes within the broad scope of the newly created third alternative. Second, using other definitions found in Section 226.2(a) of Regulation Z, in order to have a "credit sale," the defendant must be a "creditor," [1] and in order to be a "creditor", "consumer credit" must be extended [2], and to extend "consumer credit" there must be "credit" [3], and to have "credit", a "debt" must be incurred, which is not a defined term under TILA or Regulation Z. The defendant goes on to argue that because the Debtors are not obligated to the Defendant, there is no debt.

The effect of this Court's previous opinion was to delay a determinative ruling until an evidentiary hearing was held. The Defendant, through its Motion to Alter or Amend Judgment seeks to avoid such a hearing and obtain a determinative ruling at the motion stage of the cases. Courts are not disposed to make such a determination at this stage of a case. In *Clark v. Rent-it Corp.*, 685 F.2d 245 (8th Cir.1982), the court held that the plaintiff was entitled to a hearing on the issue of whether a rental agreement with an option to purchase was a credit sale and reversed the district court which had granted the defendant's motion to dismiss for reasons similar to those raised by the Defendant in the cases before this Court. *See, also Waldron v. Best T.V. and Stereo Rentals, Inc.*, 485 F.Supp. 718 (D.Maryland 1979) where the court also refused to decide at the motion stage whether a rental agreement

---

1. Defined in Section 226.2(a)(17).

2. Defined in Section 226.2(a)(12).

3. Defined in Section 226.2(a)(14).

with an option to purchase was a credit sale.

This Court agrees with the reasoning of those courts and reiterates the point made in its original opinion, that in the area of Truth in Lending it is necessary to look beyond the stated nature of a transaction to determine its true nature so as to prevent creditors from disguising the true nature of the transaction and thereby avoiding the impact of Truth in Lending. *Joseph v. Norman's Health Club, Inc.; Morse v. Same; Yost v. Same; Greco v. Same,* 336 F.Supp. 307 (E.D.Mo.1971). Therefore, at this stage of the cases it is premature to determine whether any "debt" is involved.

Such a result is buttressed by a brief historical reference to previous creditor attempts, prior to the adoption of any Federal Truth in Lending legislation to avoid the legal effects of having a transaction classified as a sale by structuring it as a lease. Both the Uniform Commercial Code and the courts rejected certain efforts to classify a sale as a lease. Section 1–201(37) of the Uniform Commercial Code states:

Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Ill.Ann.Stat. ch. 26, para. 1–201(37) (Smith–Hurd 1974). Case law supports Section 1–201(37). In *In re Loop Hospital Partnership,* 35 B.R. 929 (Bkrtcy.N.D.Ill.1983) the court held that where the essential elements of a sale are present, the transaction will constitute a sale even if it has some features of a lease, and the parties cannot change the legal effect of a transaction by simply giving it a different name.

When Congress enacted the original Consumer Credit Protection Act it determined that in certain types of consumer transac-tions disclosure of terms was to be made so that a consumer could make an informed judgment as to whether he or she wishes to enter into the transaction. The legislative history to Section 202(c) of the original Act, which defines "consumer credit sale", indicated that Congress was concerned with attempts to avoid Truth in Lending disclosures by structuring the transaction as a lease and clearly intended to include within the scope of that Act leases which in fact were installment sales. The legislative history to Section 202(c) reads as follows:

The definition of credit sale is also limited to include leases only if they are, in essence, disguised sale arrangements. The language covering disguised leases is nearly identical to the language used in the Uniform Conditional Sales Act and in many State retail installment sales acts to distinguish between "true" leases and other leases.

2 *U.S.Code Congressional and Administrative News,* Legislative History, 90th Congress Second Session 1968, pp. 1962, 1980.

Through careful drafting, the defendant is attempting to avoid the impact of both FCLA and TILA. This Court's previous Opinion finds that its effort to avoid FCLA was successful, but that a question remains as to whether those efforts were successful as to TILA. Is there a "debt" so as to bring these transactions within the scope of the technical definition of the TILA? This issue cannot be decided at the motion stage. A hearing is necessary in order for the Court to determine the true nature of the transaction. The title of the AGREEMENTS "Rental Purchase Agreement" clearly indicates that they are the type of agreements that Congress contemplated should be covered by TILA. Some of the provisions of the AGREEMENTS lead to a similar conclusion. The property subject to the AGREEMENTS can be purchased at either the inception, or termination, of the AGREEMENTS. There could be sales transactions. The prices paid at the termination stage are in excess of the prices paid at inception. That difference could be a finance charge. The issue can be deter-

mined only by looking beyond the four corners of the AGREEMENTS and examining how they were implemented and their ultimate results by considering such factors as what the consumers were told, what the consumer believed the nature of the transaction to be, and how these transactions ultimately were completed.

The Defendant's second argument is that the result reached by this Court in its previous opinion creates a third alternative to the statutory language, and by doing so they rendered the second alternative a nullity, since the second alternative is subsumed within the broad scope of the newly created third alternative. The Defendant argues that this Court's construction begs the rhetorical inquiry as to why Congress would create lengthy language concerning the two conditions that must be present in a lease if the lease is to be included within the basic definition, if Congress intended to include all leases in which the lessor (seller) is the creditor. The Defendant submits that this Court's construction renders the language concerning leases redundant and meaningless.

The Defendant's argument is premature. The Defendant would have this Court accept its labeling and characterization of the transaction. But until there is an evidentiary hearing it is impossible to determine what occurs, the nature of the transaction and whether the transaction falls within the scope of the statutory language applicable to "bailment or lease" transactions, or the other language defining "credit sale", or if, as the Defendant argues the Court is creating some third alternative.

■ Nor does this Court agree that a third alternative to the statute and regulation will be created should it ultimately find the transaction to be a "credit sale". This Court's previous opinion merely leaves the door open for a finding that different forms of sales disguised as leases, other than those specifically defined in the inclusive language referring to "bailment or lease", are subject to the remaining language defining "credit sale". It may be that the design of the transaction is yet another step to avoid a sale classification, while at the same time avoid the "bailment or lease" definition of the statute and regulation.

From the limited legislative history, it appears to this Court that Congress (1) wanted to include sales disguised as leases within the definition of the term "credit sale"; (2) included within that definition the most common practice in effect at that time for disguising credit sales by giving them the features of a lease; and (3) did not intend to restrict the basic definition of that term so as to exclude credit sales which are disguised leases, albeit disguised differently from those specified by the statute and regulation.

If after a hearing the transactions fall within the definition found in Section 226.-2(a) of the regulation, which the Defendant argues is the proper analysis, there is no reason why these transactions should not be considered a credit sale even though they may not meet the requirements of the inclusive language referring to "bailment or lease".

As the issues in *Spencer, Hanley* and *Groom* are the same, the Defendant's Motion to Dismiss filed in *Spencer* should be denied, and the Motions to Alter or Amend Judgment filed in *Hanley* and *Groom* should be considered applicable to *Spencer.*

See written Order.

## ORDER

For the reasons set forth in an Opinion filed this day:

IT IS, THEREFORE, ORDERED:

1. In order to clarify the previous order entered in *In re Hanley*, No. 89–80262, Adv. No. 89–8084; *In re Groom*, No. 89–80875, Adv. No. 89–8087; that the Motion to Dismiss is allowed as to Count I pertaining to the alleged violation of the Federal Consumer Leasing Act, and denied as to Count II pertaining to alleged violation of the Federal Truth in Lending Act.

2. In *In re Spencer*, No. 89–71262, Adv. No. 89A–7147, the Motion to Dismiss is allowed as to Count I pertaining to the alleged violation of the Federal Consumer Leasing Act, and denied as to Count II

pertaining to alleged violation of the Federal Truth in Lending Act.

3. The Motion to Alter or Amend Judgment filed in *In re Hanley* and *In re Groom* is deemed applicable to *In re Spencer;* and

4. The Motions to Alter or Amend Judgment in *In re Hanley, In re Groom,* and *In re Spencer* are hereby denied.

5. The Defendant shall have twenty-one (21) days in which to answer or otherwise plead to the complaint in all three of these adversaries.